

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NICOLE BLOW, an individual, on behalf of herself and all others similarly situated, ) ) ) | |
| Plaintiffs, ) ) | Civil Action No. 11 CV 3468 |
| v. ) ) | Hon. Charles R. Norgle |
| BIJORA, INC., doing business as AKIRA, an Illinois Corporation, ) ) ) | |
| Defendants. ) | |
| BIJORA, INC., doing business as AKIRA, an Illinois Corporation, ) ) ) | |
| Third-Party Plaintiff, ) ) | |
| v. ) ) | |
| OPT IT, INC., an Illinois Corporation, ) ) | |
| Third-Party Defendant. ) | |

**OPINION AND ORDER**

CHARLES R. NORGLE, United States District Court Judge

Plaintiff Nicole Blow ("Blow"), on behalf of herself and all others similarly situated, sues Defendant Bijora, Inc., which does business as Akira ("Akira"), for sending her and the class text messages, allegedly in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA") and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 et seq. (the "ICFA"). Shortly after Blow filed the Third Amended Complaint against Akira on June 28, 2013, Akira impleaded Opt It, Inc. ("Opt It"), which was the company that supplied the software to facilitate the texts' transmission. The Court certified the class on March 24, 2015. Before the Court are seven motions: Blow's motion for summary judgment against

Akira; Akira's motion for summary judgment against Blow; Opt It's motion for summary judgment against Akira; Akira's motion to disqualify class counsel; Akira's motion to decertify the class; Akira's motion to use a settlement agreement between Opt It and the original plaintiff in this case, Nicole Strickler; and Akira's motion for sanctions. For the following reasons, the Court finds that Blow has not produced evidence that could allow a reasonable jury to find that Akira violated the TCPA. Accordingly, Blow's motion is denied, and Akira's motion for summary judgment is granted. Akira's motion for sanctions is denied. All other pending motions are denied as moot.

## I. BACKGROUND[1]

In 2009, Opt It successfully solicited Akira to use Opt It's software-based text message transmission platform. Akira used this platform to send text messages to its customers regarding promotions and discounts on Akira products, as well as invitations to parties and events held at Akira's locations.

The parties do not dispute the following framework with respect to how Opt It's software platform works. First, Akira-customers' cell phone numbers are keyed into the platform. The phone numbers come from a variety of sources. Some of the numbers were provided by Akira's customers to one of Opt It's salespeople, who had set up a table in an Akira location that promoted Akira's text club. Other customers gave their numbers orally to Akira's sales people, while other customers filled out cards (an "Opt In Card") that stated, "Information provided to Akira is used solely for providing you with exclusive information and special offers. Akira will

---

[1] The Court has reviewed the parties' statements of material facts and responses thereto, and has struck all facts and responses that did not comply with Local Rule 56.1(b)(3)(B) from the following recital. See Petty v. City of Chicago, 754 F.3d 416, 420 (7th Cir. 2014) (holding that district court did not abuse its discretion in striking fact statements that did not comply with the Local Rules). The following undisputed facts are taken from the admissible evidence in the parties' Local Rule 56.1 statements; the Court notes contested facts where they appear.

never sell your information or use it for any other purpose." See Exhibit A to Supplemental Aff. Eric Hsueh ("Hsueh Aff."), Akira's Resp. Blow's Statement Facts Supp. Mot. Summ. J., Ex. 1. Still others joined the text club by texting "Akira" to the opt-in number that was posted in Akira stores. Using these methods, Akira received over 20,000 of its customers' phone numbers. With respect to Blow, Akira received her phone number from one of its Opt In Cards—although Blow claims that she only provided her number to Akira so that Akira could tell her when a certain style of shoes was in stock. In conjunction with the Opt In Card, Blow (or at the very least, someone using Blow's phone) also texted Akira's opt-in number to join the club on October 1, 2009.

Second, the phone numbers were loaded into Opt It's list. If the customer provided the phone number to one of Opt It's or Akira's agents, that agent would manually input the customer's phone number into Opt It's platform for Akira's text messaging campaign. If the customer texted the opt-in number for Akira's text club on her own volition, then the phone number would be added to the platform directly from the user's phone.

Third, after it gathered its customer's cell phone numbers, Akira could then use Opt It's web interface to manage its text message campaign. When Akira desired to send a text message to the list, an agent of Akira was required to log into Opt It's software platform and draft the message to be sent. The software gave the agent the option of sending the message immediately or at a specified time. If Akira intended to send the message at a later date, the agent had the additional ability to delete the message or cancel its transmission at any time before the delivery time. After receiving the transmission instruction from Akira's agent, the software sent the message to the individual customers over the internet.

The parties do not contest the following characteristics regarding the software for Opt It's

text message marketing platform. The platform does not include, and has never included, a random or sequential number generator. There is no way for third-party technology, such as a plugin or application, to augment the platform's functionality. The platform does not produce or create numbers on its own; rather, every single number in Akira's database is derived from either one of Akira's agents manually entering the phone number into the list or the customer sending a request message to Akira's opt-in number. The platform does not contain an algorithm to predict when a given subscriber would read the message, and the platform only allows Akira to send all of the messages at the same time. Moreover, the platform does not make voice calls and it cannot be used to direct a call to a live operator.

Regarding the software's upgrade capacity, Brian Stafford, Opt It's Chief Executive Officer, stated in an affidavit that:

> Opt It's software platform would have to be substantially modified to add new features that would permit the storing or production of numbers using a random or sequential number generator, or the connection of voice calls. Either such modification would require an experienced computer programmer to write source code for the new features and further source code to incorporate those features into Opt It's current software platform. Such modifications would likely take several months of development and testing. Either such modification would fundamentally alter the nature of Opt It's software platform.

Decl. Brian Stafford Supp. Opt It's Resp. Opp'n Pl.'s Mot. Summ. J. Pursuant to Fed. R. Civ. P. 56 ¶ 21 [hereinafter "Stafford Aff."], cited in Def.'s Statement Additional Facts Requiring Denial of Summ. J. ¶¶ 22-25. Other than raising an unsupported general dispute to this evidence, Blow does not challenge this view of Opt It's text messaging software platform. See, e.g., Pl.'s Resp. Additional Facts Requriing Denial Summ. J. ¶ 22 ("Plaintiff objects to Paragraph 22 as irrelevant. Notwithstanding said objection, Plaintiff disputes the facts of Paragraph 22.").

From September 23, 2009 until May 27, 2011, Akira sent approximately sixty text messages in the manner described above to more than 20,000 cell phones, including Blow's.

4

These texts advertised store promotions, sales, fashion shows, events, parties, contests, and giveaways for Akira.

Blow's two-count Third Amended Complaint was filed on April 26, 2013, and alleges violations of the TCPA and the ICFA. On behalf of the class, Blow claims over $1,800,000,000 ($1,500 for each of the 1,200,000 texts sent) in statutory damages. See 47 U.S.C. § 227(b)(3). After the Court certified the class, Blow and Akira cross-filed motions for summary judgment, pursuant to Federal Rule of Civil Procedure 56.[2] These motions have been fully briefed and are now before the Court.

## II. DISCUSSION

### A. Standard of Decision

"Summary judgment is appropriate only where there are no genuine issues of material fact and the moving parties are entitled to judgment as a matter of law." Hart v. Mannina, 798 F.3d 578, 584 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(a)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Wells v. Coker, 707 F.3d 756, 760 (7th Cir. 2013) (internal quotation marks and citation omitted).

"In reviewing cross-motions for summary judgment, [the Court] take[s] the motions one at a time and then, as usual, construe[s] all facts and draw[s] all reasonable inferences in favor of the non-moving party." Advance Cable Co., LLC v. Cincinnati Ins. Co., 788 F.3d 743, 746 (7th Cir. 2015). "On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder."

---

[2] Opt It also filed a motion for summary judgment as to Akira, seeking a judgment in its favor regarding Akira's breach of contract and indemnification claims against it. The Court granting of Akira's motion renders Opt It's motion moot; the Court need not discuss Opt It's involvement in the procedural history of this case.

Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). But the Court "will not draw inferences that are 'supported by only speculation or conjecture.'" Williams v. Brooks, No. 15-1763, 2016 WL 51409, *4 (7th Cir. Jan. 5, 2016).

**B. The Merits**

The TCPA "prohibits any person, absent the prior express consent of a telephone-call recipient, from 'mak[ing] any call . . . using any automatic telephone dialing system . . . to any telephone number assigned to a paging service [or] cellular telephone service.'" Campbell-Ewald Co. v. Gomez, — S. Ct. —, No. 14-857, 2016 WL 228345, *3 (U.S. Jan. 20, 2016) (quoting 47 U.S.C. § 227(b)(1)(A)(iii)). Text messages are considered a "call" for the purposes of the TCPA. Id. The predominant and dispositive issue in this case is whether Opt It's software platform constitutes an automatic telephone dialing system ("ATDS" or "autodialers") as defined by the TCPA. If Akira did not use an ATDS, there can be no TCPA violation. See Norman v. AllianceOne Receivables Mgmt., Inc., No. 15-1780, 2015 WL 9268778, *1 (7th Cir. Dec. 22, 2015) (holding manually dialed calls do not constitute a violation of the TCPA); Satterfield v. Simon & Schuster, No. C 06-2893 CW, 2007 WL 1839807, *6 (N.D. Cal. June 26, 2007) (granting summary judgment to defendants where plaintiff could not produce evidence showing that equipment was an ATDS), rev'd on other grounds, 569 F.3d 946 (9th Cir. 2009) (reversing and remanding because court conducted incorrect analysis of ATDS issue).

*1. Automatic telephone dialing systems under the TCPA.*

The TCPA defines an ATDS as "equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers." 47 U.S.C. § 227(a)(1). The Federal Communications Commission ("FCC") has

6

adopted the TCPA's definition verbatim. See 47 C.F.R. § 64.1200(f)(2) ("The terms automatic telephone dialing system and autodialer mean equipment which has the capacity to store or produce telephone numbers to be called using a random or sequential number generator and to dial such numbers.").

There is currently a dearth of appellate discussion regarding the circumstances in which a system is considered an ATDS for purposes of the TCPA. The handful of appellate courts that even discuss the definition do so only by citing to FCC orders, with very little collateral interpretation. See, e.g., Dominguez v. Yahoo, Inc., No. 14-1751, 2015 WL 6405811, *2 (3d Cir. Oct. 23, 2015); Satterfield, 569 F.3d at 950-51. Accordingly, they are of limited use in the Court's search for an articulable definitional spectrum for an ATDS.

While keeping in mind the TCPA's statutory language as it defines ATDS, the Court examines three applicable FCC rulings, which define the contours of the statutory definition in much greater detail. After Congress passed the TCPA in 1991, the FCC issued its first guidance and rulemaking regarding the definition of an ATDS on October 16, 1992. See Rules & Regulations Implementing the Tel. Consumer Protection Act of 1991, 7 FCC Rcd. 8752 (1992) [hereinafter 1992 FCC Order]. In its 1992 Order, the FCC explicitly adopted the statutory definition of an ATDS in its rule promulgation. See id. at 8755 n.6. At the time the FCC issued its Order, text messaging had not yet been invented,[3] and consequently, the FCC did not discuss the interplay between the TCPA and automated text messaging platforms. The FCC did, however, discuss the TCPA's applicability to "voice messaging services"—"services which store and forward messages for later delivery to the called party." Id. at 8776. The FCC ruled that "[t]he prohibitions of § 227(b)(1) clearly do not apply to functions like 'speed dialing,' 'call

---

[3] The FCC issued its Order on October 16, 1992. The first text message was sent on December 3, 1992. See Hppy bthdy txt!, BBC News (Dec. 3, 2002), http://news.bbc.co.uk/2/hi/uk_news/2538083.stm.

7

forwarding,' or public telephone delayed message services (PTDMS), because the numbers called are not generated in a random or sequential fashion." Id. After analogizing voice messaging services to the above functions, and ruling that these types of services also fall outside the TCPA, the FCC also ruled "that the prohibitions set forth in the rules are not a barrier to the continued use and expansion of voice messaging services." Id. at 8777.

By 2002, the FCC had observed that the telemarketing industry had changed dramatically since its original rule promulgation in 1992; given this change, the FCC decided to revise its rules. See In re Rules & Regulations Implementing Tel. Consumer Protection Act of 1991, 18 FCC Rcd. 14014, 14026 (2003) [hereinafter 2003 FCC Order]. Aside from specifically including text messages (also called short message service "SMS" calls) as "calls" for the purpose of the TCPA, see id. at 14115, the FCC modernized the definition of an ATDS. See id. at 14090-95. In its 2003 Order, the FCC expanded the definition of an ATDS to include "war dialing"—calling large blocks of numbers to identify which numbers were fax machines, id. at 14094, and "predictive dialers"—"equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls." Id. at 14091. In discussing whether to bring predictive dialers within the definition of an ATDS, the FCC considered some commenters' argument that predictive dialers could not be considered an ATDS because the dialers do not dial numbers randomly or sequentially. Id. at 14090. The FCC, however, rejected that argument, and placed heavy emphasis on the "capacity" component of the statutory definition. Id. at 14091-92 (citing 47 U.S.C. § 227(a)(1)). Because predictive dialers dial numbers according to an algorithm—hence, without human intervention— the FCC found enough automation in the system to include predictive dialers in the definition of an ATDS. Id. In giving a liberal construction to the word "capacity," the FCC ruled that even

8

though random or sequential number generation was not <u>actually</u> used in a case involving a predictive dialer, the predictive dialer would still be considered an ATDS if the equipment possessed the capacity to dial random or sequential phone numbers. <u>2003 FCC Order</u>, 18 FCC Rcd. at 14092.

On July 15, 2015, the FCC issued its latest ruling interpreting the statutory definition of an ATDS for the TCPA. <u>See</u> <u>In re Rules & Regulations Implementing the Tel. Consumer Protection Act of 1991</u>, 30 FCC Rcd. 7961 (2015) [hereinafter <u>2015 FCC Order</u>]. This Order—entered more than six years after Akira commenced its text campaign and more than four years after Nicole Strickler[4] filed her complaint—greatly expanded the definition of an ATDS. In this Order, the FCC adopted the contention that dialing equipment is an ATDS even when it does not have the "'current capacity' or 'present ability' to generate or store random or sequential numbers or to dial sequentially or randomly at the time the call is made." <u>Id.</u> at 7974. In this new ruling, the FCC used language from its 2003 Order, which discussed capacity within the context of predictive dialers. <u>See</u> <u>id.</u> at 7971-72 (citing <u>2003 FCC Order</u>, 18 FCC Rcd. at 14091-94) ("[D]ialing equipment generally has the capacity to store or produce, and dial random or sequential numbers (and thus meets the TCPA's definition of 'autodialer') even if it is not presently used for that purpose, including when the caller is calling a set list of consumers."). While the 2003 Order limited this expanded definition to predictive-dialer systems (as they still had the present capacity to store or dial random or sequential numbers), the 2015 Order removed the predictive-dialer circumscription, yet:

---

[4] Ms. Strickler originally filed this complaint on May 24, 2011. After Opt It discovered that Strickler was one of the attorneys at Messer & Stilp (now Messer, Stilp & Strickler), the law firm representing the class, the magistrate judge allowed Strickler to exit the case. After Strickler settled her individual claim with Opt It (thereby dismissing it from the case), the magistrate judge allowed Blow to be substituted in Strickler's stead.

> [R]eiterate[d] what the Commission has previously stated regarding the parameters of the definition of "autodialer." First, the Commission found in its original [1992] TCPA proceeding that the "prohibitions of [section] 227(b)(1) clearly do not apply to functions like 'speed dialing.'" Second, the Commission has also long held that the basic functions of an autodialer are to "dial numbers without human intervention" and to "dial thousands of numbers in a short period of time." How the human intervention element applies to a particular piece of equipment is specific to each individual piece of equipment, based on how the equipment functions and depends on human intervention, and is therefore a case-by-case determination.

2015 FCC Order, 30 FCC Rcd. at 7975. Of the five-member panel, two commissioners dissented from the ruling, reasoning that the newly-expanded definition of "capacity" "dramatically departs from the ordinary use of the term." See id. at 8075 (statement of Commissioner Pai, dissenting); see also id. at 8088 (statement of Commissioner O'Rielly, dissenting) ("[E]quipment must have the capacity to function as an autodialer *when the call is made* not at some undefined future point in time.").

*2. The precedential weight afforded to FCC rulings by the Court.*

A pair of principles provides the frame by which the Court may consider these FCC rulings. First, the Supreme Court has recognized that FCC orders are entitled to deference under Chevron because Congress intended such rulings to have the full force and effect of law. See Nat'l Cable & Telcomm. Ass'n v. Brand X Internet Serv., 545 U.S. 967, 980-81 (2005) (citing United States v. Mead Corp., 533 U.S. 218, 231-34 (2001)). The second principle, more relevant to this Court, is that under the interplay between the Hobbs Act, 28 U.S.C. § 2342(1), and the Telecommunications Act, 47 U.S.C. § 402(a), district courts generally may not "enjoin, set aside, suspend (in whole or in part), or [] determine the validity of" FCC orders. See 28 U.S.C. § 2342. Thus, the FCC rulings are binding upon the Court, and the Court lacks the jurisdiction to determine whether the FCC acted with the scope of its statutory mandate.

Akira concedes that the 2015 FCC Order applies retroactively to this situation, and

10

instead attacks the Order on its face, arguing that the FCC's newly-expanded definition runs afoul of the controlling statutory definition of an ATDS. While the FCC's new definition may well tread outside the scope of the TCPA, that issue is not before the court. The Court has no jurisdiction to determine the validity of the FCC's recent ruling, even collaterally. See 28 U.S.C. § 2342(1); CE Design, Ltd. v. Prism Business Media, Inc., 606 F.3d 443, 448 (7th Cir. 2010) (rejecting contention that a district court could wait to determine its jurisdiction until after it found that FCC ruling did not deserve deference under Chevron). With the FCC's definitional interpretations as a lens, the Court analyzes the proffered material relevant to Opt It's text messaging platform.

    *3. Whether the marketing software used by Akira is an ATDS.*

    Akira argues that the Opt It software platform is not an ATDS because it not does have, and could never have, the capacity to use a random or sequential number generator to send text messages. Akira also notes that, while Opt It's platform is software-based, it uses no algorithms to gather phone numbers, draft the messages, or decide when to send the messages.

    While Blow does not dispute the facts regarding the present functionality of the Opt It platform, she argues that recent FCC rulings hold that internet-to-phone text messages—the method used by Akira to send its messages—are, categorically, automated telephone dialing systems, notwithstanding each individual platform's individual characteristics.In addition, Blow argues that the Opt It platform is an ATDS because the platform has "'the capacity to dial numbers without human intervention.'" Pl.'s Mem. Supp. Mot. Summ. J. 7 [hereinafter "Pl.'s Mem."] (quoting 2003 FCC Order, 18 FCC Rcd. at 14092). The parties use the following uncontested discrete characteristics of Opt It's platform as support for their assertions:

    First, if a user wants to transmit texts using the platform, the user must "provide[] the

system with a list of phone numbers." See Pl.'s Mem. at 7. The uncontested facts show that Akira did not purchase an existing list from a third party. Rather, every single phone number entered into the messaging system was keyed via human involvement in one of two ways: either an Akira employee (or agent) would key the number into the platform, or the customer herself would send her phone number to the platform.

And the level of human involvement is not restricted to the keying of numbers into the software. Once the user inputs the number into the messaging platform, the user must manually draft the message that the platform will send. Then, the user must specify whether to send the message immediately or at some specified time. The uncontested facts show that the technology in this case does not possess or even contemplate the *sine qua non* of a predictive dialer—the "timing function." See 2003 FCC Order, 18 FCC Rcd. at 14091 ("The principal feature of predictive dialing software is a timing function, not number generation or storage."). The FCC considers predictive dialers to fall within the definition of an ATDS because the dialer itself, and not the user, decides when to call. See id. With Opt It's platform, on the other hand, the user is in full control as to when to send the message.

In short, the uncontested facts demonstrate that human involvement is required at nearly every step in the platform's text message transmission process. While the 2015 FCC Order expanded the definition of an ATDS, the Order did not make a blanket proclamation that all internet-to-phone platforms are autodialers categorically. Instead, the FCC explicitly stated that whether a particular piece of equipment was an ATDS was a "case-by-case determination." See 2015 FCC Order, 30 FCC Rcd. at 7975.

Moreover, Blow has not produced any admissible evidence that would allow a reasonable jury to conclude that the platform has any conceivable capacity to store or otherwise generate

12

numbers—whether random, sequential, or from a defined list—on its own, and without human involvement. In fact, Brian Stafford's testimony—the only admissible evidence that pertains to the capacity of the software platform—states that altering the platform to give it the capacity to produce or transmit random or sequential numbers would require a rewrite (and attendant recompilation) of the platform itself. The finished product would be, at its heart, a fundamentally different piece of software—not the one Akira used in its campaign.

Furthermore, Blow's argument, which suggests that an ATDS is any device that uses electronic pulses to transmit data, is unpersuasive. See Pl.'s Mem. at 7 (arguing that the Opt It platform is an ATDS because it, *inter alia*, "push[ed]" texts to plaintiffs and "has the capacity to send text messages without human intervention at a predetermined date and/or time in the future"). Under this reasoning, virtually all telecommunication devices would be considered autodialers, a construction that is unsupported by both the statutory language of the TCPA and the FCC's rulings. For example, if Cletus texts Rose using a cellular phone, no reasonable person would say that the phone was sending the text automatically, even though complex software, interfaced with hardware, actually facilitated the text's transmission from Cletus to Rose. Even if Cletus sends a group text message to everyone in his contact list, the level of human involvement remains the same. After receiving contacts from other humans, a human decides who will receive the message, what the message will say, and when the message will be sent. The situation is no different in this case than in the above example, except in terms of scale. Accordingly, the Court finds that Opt It's platform has a functional capacity that is akin to a sophisticated speed dialer, technology that the FCC explicitly held was not an ATDS. See 2015 FCC Order, 30 FCC Rcd. at 7975.

In essence, Plaintiff argues that because a software developer could write a piece of code

13

that dials (or texts) random or sequential numbers, <u>all</u> code that has some metaphysical connection to transmitting text messages is considered an ATDS. Regardless of the inherent problems that could result from Blow's broad argument, she has produced no evidence that could allow a reasonable jury could find that the software platform had the statutory "capacity" to store or call random or sequentially-generated telephones without human involvement. Given this lack of admissible evidence, the Court finds as a matter of law that the software platform is not an ATDS. Because the software platform used by Akira is not an ATDS, Akira's text messaging campaign did not violate the TCPA. Accordingly, the Court grants summary judgment in favor of Akira and denies Blow's motion for summary judgment.

In her Third Amended Complaint, Blow asserts that federal subject matter jurisdiction is premised only on the federal-question statute, 28 U.S.C. § 1331, and the supplemental jurisdiction statute, 28 U.S.C. § 1367. Blow makes no jurisdictional claim under the Class Action Fairness Act's minimal diversity statute, 28 U.S.C. § 1332(d). <u>See</u> Third Am. Compl. ¶ 2. As the Court has resolved the federal question (the TCPA claim) in favor of Akira, the Court relinquishes jurisdiction over the remaining state law claim (the ICFA claim), pursuant to 28 U.S.C. § 1367(c)(3). Therefore, Opt It's motion for summary judgment against Akira, Akira's motion to disqualify class counsel, Akira's motion to decertify the class, and Akira's motion to use the Opt It-Strickler settlement agreement are all denied as moot.

**C. Akira's Motion for Sanctions**

Akira has also moved the Court to sanction Blow's counsel for what Akira considers to be frivolous filings and various instances of bad-faith conduct over the course of this litigation. "'Federal Rule of Civil Procedure 11 permits a court to sanction an attorney for a pleading or other document that (among other potential transgressions) is presented for an improper purpose

or makes factual representations that are without reasonable evidentiary support.'" Morjal v. City of Chicago, 774 F.3d 419, 422 (7th Cir. 2014) (quoting Johnson v. Cherry, 422 F.3d 540, 548-49 (7th Cir. 2005)). In addition, "under 28 U.S.C. § 1927, an attorney 'who so multiplies the proceedings in any case unreasonably and vexatiously' may be held to account for the excess fees and other costs resulting from [his] improper conduct." Id. The decision to award sanctions is within the inherent authority of the Court. See id.

In this case, the Court finds that the litigational conduct of Blow's counsel did not rise to the level of impropriety that would warrant sanctions. Akira's motion for sanctions is denied.

### III. CONCLUSION

In conclusion, Blow has failed to produce evidence that would allow a reasonable jury to conclude that the software platform used by Akira in this case had the capacity (as interpreted by the FCC) to "store or produce telephone numbers to be called, using a random or sequential number generator," see 47 U.S.C. § 227(a)(1)(A), that would cause Akira to be in violation of the TCPA. See id. § 227(b)(1). Because Blow cannot meet an essential element to succeed on a TCPA claim, the Court grants Akira's motion for summary judgment, and denies Blow's motion for summary judgment. The case is terminated.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: February 4, 2016

15