CERTIFIED COPY

A True Copy
Teste:

_Christie Duff Holmes_
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 16-1484 & 16-1608

NICOLE BLOW, individually and on
behalf of all others similarly situated,

*Plaintiff-Appellant, Cross-Appellee*,

*v.*

BIJORA, INC., doing business as
AKIRA,

*Defendant-Appellee, Cross-Appellant.*

———————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 CV 3468 — **Charles R. Norgle**, *Judge.*

———————

ARGUED OCTOBER 28, 2016 — DECIDED MAY 4, 2017

———————

Before RIPPLE, KANNE, and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. In May 2011, Nicole Strickler
brought this class-action lawsuit against Chicago-based retailer

Bijora, Inc., doing business as Akira.[1] Strickler was later
replaced as named plaintiff by Nicole Blow, who alleged that
Akira's practice of sending promotional text messages violates
the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C.
§ 227, and the Illinois Consumer Fraud and Deceptive Business
Practices Act, 815 ILCS 505/1-12, and sought approximately
$1.8 billion in damages. The district court ultimately certified
a class of individuals with a series of Illinois telephone area
codes who had received automated texts from Akira in the
preceding four years. After Strickler filed her third amended
complaint, Akira impleaded the company that supplied its
software for the text transmissions, Opt It, Inc. Opt It then
settled its claims with Strickler, who was replaced by Blow as
the named plaintiff in the suit against Akira. On Blow and
Akira's cross motions for summary judgment, the district court
ultimately granted summary judgment in favor of Akira after
concluding that Blow had failed to demonstrate that Akira
used an automatic telephone dialing system in violation of the
TCPA. Blow appeals, and Akira cross-appeals, challenging the
class certification and renewing its request for sanctions
against Blow's counsel for alleged misconduct and frivolous
filings. As detailed below, we affirm the judgment of the
district court, although on different grounds.

I.

In 2002, Eric Hseuh founded Chicago-based apparel retailer
Akira. The boutique women's clothing and accessory store has

---

[1] We follow the defendant's lead and refer to it by its recognized business
name, Akira.

continued to expand since that time and now boasts over twenty retail locations in the Chicagoland area. In 2009, Chicago-based software company Opt It, Inc. approached Akira and offered its text marketing services to the clothing chain. Akira hired Opt It to use its software text-messaging platform to connect with Akira customers and inform them of promotions, discounts, and in-store special events such as parties. Using a variety of methods, Akira gathered its customers' cell phone numbers for Opt It to key into its messaging platform. Specifically, Akira customers could opt in to its "Text Club" by providing their cell phone numbers to Akira representatives inside stores, by texting the word "Akira" to an opt-in number posted in Akira stores, or by filling out an "Opt In Card." The card stated that, "Information provided to Akira is used solely for providing you with exclusive information or special offers. Akira will never sell your information or use it for any other purpose."

Opt It's software platform used a fairly straightforward system to deliver text messages to Akira customers. First, customers' cell phone numbers were loaded onto Opt It's text messaging system platform. Those numbers given directly to an Akira employee were manually entered into the system, and the numbers customers texted directly to the opt-in number were automatically added to Opt It's platform. Akira could then manage its promotional text messaging system using Opt It's web interface, where an Akira employee could log in and draft a message to be sent to its text club customers. The Akira employee drafting the message then had the option to send the message immediately or set a future date and time for the message to be sent to all of the saved numbers. If Akira

decided to change or cancel a message intended for future delivery, it could access the system and alter the message before it was sent or delete it altogether.

Akira gathered cell phone numbers for over 20,000 customers for its text club messages. From September 23, 2009 until May 27, 2011, Akira sent some sixty text messages advertising store promotions, parties, events, contests, sales, and give-aways to those 20,000 customers, including appellant Nicole Blow.

Blow was chosen as class representative after problems arose with her two predecessors. The original named plaintiff, Nicole Strickler, worked as an attorney for the law firm filing the complaint, Messer & Stilp, Ltd.[2] Strickler's connection with the firm emerged after the class had been certified, and Messer had filed a second amended complaint asserting claims against Akira and Opt It. Opt It then moved to disqualify the firm based on its failure to disclose that Strickler worked there. Strickler, through Messer, ultimately settled with Opt It and dismissed her claims against it. Meanwhile, Akira had moved to adopt Opt It's motion to disqualify Messer, which requested time to find a substitute class representative. It solicited two additional plaintiffs from the class, Nicole Blow and Jennifer Glasson. When it came to light that Glasson had never received Akira's texts, Glasson voluntarily dismissed her claims and Blow continued as the sole named plaintiff.

Blow's two count third-amended complaint alleges that Akira violated the TCPA's prohibition against using an

---

[2] Now Messer, Stilp & Strickler, Ltd.

Nos. 16-1484 & 16-1608                                          5

automatic telephone dialing system to make calls without the express consent of the recipient. On behalf of the class, Blow claims over $1.8 billion in statutory damages, a figure that includes treble damages for alleged willful and knowing violations of the TCPA. *See* 47 U.S.C. § 227(b)(3). Both parties moved for summary judgment. Akira also moved, among other things, to decertify the class and for sanctions against Blow under Federal Rule of Civil Procedure 11. After concluding that the software platform Opt It used to send text messages was not an autodialer as prohibited by the TCPA, the district court granted summary judgment to Akira. That conclusion rendered the remainder of Akira's pending motions moot, with the exception of the motion for sanctions, which the court denied. Blow appeals the district court's grant of summary judgment to Akira, and Akira cross-appeals the district court's denial of its motions for class decertification and for sanctions under Rule 11.

## II.

We consider first the district court's grant of summary judgment to Akira. We review the district court's decision on cross-motions for summary judgment de novo. *E.g.*, *Selective Ins. Co. v. Target Corp.*, 845 F.3d 263, 266 (7th Cir. 2016). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment: we construe all facts and inferences arising from them in favor of the party against whom the motion under consideration is made. *Calumet River Fleeting, Inc. v. Int'l Union of Operating Eng'rs, Local 150, AFL-*

*CIO*, 824 F.3d 645, 647–48 (7th Cir. 2016). Because we are considering whether the district court appropriately granted summary judgment to Akira, we resolve all factual disputes in Blow's favor. If Blow "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

As relevant here, the TCPA prohibits making "any call" without the prior express consent of the recipient "using any automated telephone dialing system" ("autodialer") to "any telephone number assigned to a paging service [or] cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii); *see also Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 666–67 (Jan. 20, 2016). It is uncontested that text messages to a cellular phone constitute "calls" within the purview of § 227(b)(1)(A)(iii). *Campbell-Ewald*, 136 S. Ct. at 667; *see also In Re Rules & Regs Implementing the TCPA*, 18 FCC Rcd, 14014, 14115 ¶ 165 (2003) (confirming that § 227(b)(1)'s prohibition against autodialing "encompasses both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls"). Congress conferred on the Federal Communications Commission ("FCC") the authority to "prescribe regulations to implement" the TCPA. 47 U.S.C. § 227(b)(2); *see also id.* § 201(b) ("The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter."). Violations of the TCPA may be redressed by a private right of action for damages, § 227(b)(3), which consist of either $500 for each violation or recovery for "actual monetary loss" resulting from the violation, "which-

ever is greater," *id.* at § 227(b)(3)(B). The TCPA authorizes treble damages if the defendant "willfully and knowingly violated" the Act. *Id.* at § (b)(3); *Campbell-Ewald*, 136 S. Ct. at 667. Based on these provisions, Blow seeks $1,500 for each of the 1,200,000 texts sent for a total of over $1.8 billion in statutory damages.

The district court's conclusion that Akira was entitled to summary judgment was premised on its determination that Akira, through Opt It, had not used an autodialer to send the promotional text messages to Blow and the other class members. Before considering whether Opt It's platform was an autodialer, we must confront Blow's argument that Akira "admitted" in the district court to using an autodialer. This argument arises from one of Akira's responses to a request for admission by Blow.

Between the complaint and requests for admission in discovery, Blow sought on six occasions to have Akira admit that Opt It sent text messages using an autodialer. As relevant here, Blow submitted four nearly identical requests for admission as follows:

13. There are more than 40 individuals with cellular telephones with Illinois area codes (217, 224, 309, 312, 331, 464, 618, 630, 708, 773, 779, 815, 847, or 872) to whom, on or after a date four years prior to the filing of this action and on or before a date 20 days following the filing of this action, Defendant or Defendant's Agent sent text messages utilizing an Auto Dialer, which marketed Defendant's products and/or services.

RESPONSE:   Admit except unknown if Opt It used an 'Auto Dialer.'

14. There are more than 100 individuals with cellular telephones with Illinois area codes (217, 224, 309, 312, 331, 464, 618, 630, 708, 773, 779, 815, 847, or 872) to whom, on or after a date four years prior to the filing of this action and on or before a date 20 days following the filing of this action, Defendant or Defendant's Agent sent text messages utilizing an Auto Dialer, which marketed Defendant's products and/or services.

RESPONSE:   Admit except unknown if Opt It used an 'Auto Dialer.'

Request for admission number fifteen was identical except it identified "more than 500 individuals" in the first sentence, and again Akira replied with "Admit except unknown if Opt It used an 'AutoDialer.'" Admission number sixteen too was identical but for the initial number of listed individuals and this time, as shown below, Akira omitted from its response the phrase "except unknown if Opt It used an 'AutoDialer.'":

16. There are more than 1,000 individuals with cellular telephones with Illinois area codes (217, 224, 309, 312, 331, 464, 618, 630, 708, 773, 779, 815, 847, or 872) to whom, on or after a date four years prior to the filing of this action and on or before a date 20 days following the filing of this action, Defendant or Defendant's Agent sent text messages utilizing an Auto Dialer, which marketed Defendant's products and/or services.

RESPONSE:  Admit.

When Akira was preparing its response to Blow's statement of undisputed material facts in support of summary judgment, it realized that the phrase "unknown if Opt It used an 'Auto-Dialer'" had been omitted from its fourth response to Blow's request for admission. Specifically, when Blow moved for summary judgment, she sought to rely on Akira's supposed "admission" that Opt It used an autodialer. Upon discovering its error, Akira moved for leave to serve an amended response correcting the mistake. The district court granted Akira's motion and allowed Akira to amend its response to bring it in line with its preceding—and otherwise identical—responses.

Blow argues on appeal that the district court erred by allowing Akira to amend its response to the request for admission. Specifically, Blow claims that Akira had many opportunities to notice the alleged error in its discovery response. She argues that Akira's belated motion to amend its response—made during briefing on summary judgment—prejudiced her because by that point she had relied on what she characterizes as Akira's "judicial admission" that it used an autodialer to send texts.

Federal Rule of Civil Procedure 36, which governs Requests for Admission, states that a "party may serve on any other party a written request to admit, for purposes of the pending action only, the truth of any matters within the scope of [Federal Rule of Civil Procedure] 26(b)(1) relating to: (A) facts, the application of law to fact, or opinions about either; and (B) the genuineness of any described documents." Rule 36 further provides that "[i]f a matter is not admitted, the answer must

specifically deny it or state in detail why the answering party cannot truthfully admit or deny it." Fed. R. Civ. P. 36(a)(4). The rule also specifies that matters admitted are conclusively established "unless the court, on motion, permits the admission to be withdrawn or amended." *Id.* 36(b). Such a withdrawal or amendment is appropriate if it "would promote the presentation of the merits of the action" and if the party who obtained the admission will not be prejudiced by a withdrawal or amendment. *Id.*

We review a court's decision to allow the withdrawal or amendment of an earlier admission only for an abuse of discretion. *See Banos v. City of Chicago*, 398 F.3d 889, 892 (7th Cir. 2005); *Perez v. Miami-Dade Cty.*, 297 F.3d 1255, 1265 (11th Cir. 2002). We find no abuse of discretion here. The district court reasonably concluded after considering the entirety of the litigation and the discovery responses surrounding Akira's supposed "admission" that Akira had inadvertently failed to add the phrase "except unknown if Opt It used an 'Auto Dialer'" in its response to Request for Admission No. 16. It follows from this conclusion that allowing the amendment would support a decision on the merits rather than on an inadvertent omission by Akira.

The district court also did not abuse its discretion by concluding that Blow was not prejudiced by Akira's amendment. She claims that she "relied" on the alleged admission that Akira or Opt It sent texts using an autodialer. But none of the parties' exchanges during discovery would have supported such a reliance. Moreover, as the district court noted in its decision denying Blow's motion to reconsider after the grant of summary judgment, when the district court allowed Akira's

amendment, Blow never moved at that time to reopen discovery or otherwise demonstrated how she was prejudiced by the court's decision. And as the party seeking summary judgment, Blow bore the burden of demonstrating that Akira or its agent Opt It *did* in fact use an autodialer, so it was not prejudice to require her to prove the elements of her claim. *See Perez*, 297 F.3d at 1266 ("The prejudice contemplated by the Rule is not simply that the party who initially obtained the admission will now have to convince the fact finder of its truth. Rather, it relates to the difficulty a party may face in proving its case, e.g., caused by the unavailability of key witnesses, because of a sudden need to obtain evidence with respect to the questions previously answered by the admission.") (internal quotations and citation omitted). It would have been unreasonable for Blow to believe Akira had admitted to using an autodialer in one response to a request for admission despite denying the use of an autodialer in every other response to Blow's filings. Thus, the district court did not abuse its discretion in allowing Akira to amend its response on request No. 16 to bring it in line with its nearly identical responses to requests Nos. 13–15.

On the merits, the question of whether Akira, through Opt It, used an autodialer is less straightforward. The TCPA defines an autodialer as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1); *see also* 47 C.F.R. § 64.1200(f)(2) (FCC adopting the TCPA's autodialer definition). The statute's reference to a "random or sequential number generator" stems from telemarketers' practice of using autodialing equipment to either dial random 10-digit strings of numbers or call numbers

in large sequential blocks. Thus, the FCC initially interpreted the TCPA autodialer ban as targeting equipment that placed many calls by randomly or sequentially generating numbers to be dialed.

As technology and telemarketing methods have evolved and expanded, however, so has the FCC's definition of an autodialer. In 2003, the FCC explained that although in "the past, telemarketers may have used dialing equipment to create and dial 10-digit numbers arbitrarily, the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective." *In re Rules & Regs Implementing the TCPA*, 18 FCC Rcd. 14014, 14092 (2003) ("2003 FCC Order"). In continuing to expand the definition of an autodialer, the FCC observed that it was "clear from the statutory language and the legislative history that Congress anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies." *Id.* Thus in 2003 and again in 2008, the FCC determined that "predictive dialers," which dial numbers from customer calling lists, fell within the meaning and statutory definition of an autodialer and the intent of Congress. *See id.* at 14093; *see also In re Rules & Regs Implementing the TCPA*, 23 FCC Rcd. 559, 566 (2008) ("affirm[ing] that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers"). And in 2012, it reiterated this conclusion, noting that the TCPA covered systems with the "capacity to store or produce and dial those numbers at random, in sequential order, *or from a database of numbers*." *In re Rules & Regs Implementing the TCPA*, 27 FCC Rcd 15391, 15392 n.5 (2012) (emphasis added).

This expansive reading of the TCPA in light of evolving technology continued in 2015 when a divided panel of the FCC released an order responding to numerous petitions by companies and trade associations seeking relief or clarification of the TCPA's requirements. Specifically, the FCC further broadened the definition of an autodialer under the TCPA by concluding that equipment's "capacity" to dial random or sequential numbers is not limited to its "present ability." The FCC rejected requests to limit the definition of an autodialer to equipment with the "'current capacity' or 'present ability' to generate or store random or sequential numbers or to dial sequentially or randomly at the time a call is made." *In re Rules & Regs Implementing the TCPA*, 30 FCC Rcd. 7961, 7972 (2015) ("2015 FCC Order"). Observing that Congress intended a "broad definition of autodialer," the FCC concluded that "the capacity of an autodialer is not limited to its current configuration but also includes its potential functionality." *Id.* at 7974.

It is against this backdrop that we consider Akira's claim that it is entitled to summary judgment because Opt It's platform is not an "autodialer" under the TCPA. Akira relies on the affidavit of Opt It's CEO Brian Stafford to support its argument that the platform it used was not an autodialer. Stafford explained the process described above—that Opt It obtained a spreadsheet of customer phone numbers from Akira and imported those numbers into its system and that telephone numbers texting the message "Akira" to the short code Akira provided were automatically added to Opt It's text messaging list. As the software architect for the first version of Opt It's software platform, Stafford reiterated, as the district court found, that a human must take action to send a message

through the platform. The messages are drafted by humans, who decide when the message will be sent, and press a button to either send the messages or schedule a future sending. Stafford also explained that the Opt It platform lacked the ability to store or produce numbers using a random or sequential number generator and that its platform would have to be substantially modified to do so. Stafford also opined that such modifications would fundamentally alter the nature of Opt It's software platform.

Although Stafford's affidavit establishes that Opt It's platform lacks the present capacity to use a random or sequential number generator for storing or producing numbers, it falls short of entitling Akira to summary judgment on this issue given the FCC's conclusion that equipment need not possess the "current capacity" or "present ability" to use a random or sequential number generator. 2015 FCC Order at 7972.

Citing cases that predate the FCC's most recent rulings, Akira argues that Opt It's software must be able to dial random or sequential numbers at the time the call is made and also function entirely "without human intervention." As for the first argument, the FCC explicitly rejected such a requirement in its 2015 Order. *See* 2015 Order at 7074 (term "capacity" in the TCPA "does not exempt equipment that lacks the 'present ability' to dial randomly or sequentially.") As the FCC rulings have recognized, technology has developed such that dialing from lists of numbers is more cost-effective than using random or sequential numbers. The FCC has now long recognized that "predictive dialers," which have "the capacity to *store* or produce numbers and dial those numbers at random, in sequential order, *or from a database of numbers*," 2003 FCC Order

Nos. 16-1484 & 16-1608                                    15

at 14091(emphasis added), are autodialers under the TCPA. In concluding as much, the FCC noted that "the principal feature of predictive dialing software is a timing function, *not number storage or generation.*" *Id.* (emphasis added). Thus, "the basic function of such dialing equipment … [is] the capacity to dial numbers without human intervention." *In Re Rules & Regs Implementing the TCPA* 23 FCC Rcd. 559, 566 (2008).

The parties dispute whether Opt It's software is in fact capable of dialing numbers without human intervention. The district court relied on Stafford's affidavit to conclude that Opt It's software is not an autodialer because human involvement is required at *nearly* every step in the platform's text message transmission process. But as Blow points out, the district court's use of the word "nearly" demonstrates that human involvement is in fact unnecessary at the precise point of action barred by the TCPA: using technology to "push" the texts to an aggregator that sends the messages out simultaneously to hundreds or thousands of cell phone users at a predetermined date or time. Indeed, the FCC has recognized as much by sweeping automated dialing systems that dial numbers from a preprogrammed list, created by humans, within the reach of the TCPA's prohibition on autodialed calls without prior consumer consent. Given the expansive definition of an autodialer adopted by the FCC, we agree with Blow that summary judgment on this issue for Akira was premature.

Because, as discussed below, we conclude that summary judgment in favor of Akira was nevertheless appropriate on another ground, we need not address Akira's alternate autodialer arguments, including its assertion that the FCC Orders are not controlling—an argument that in any event is

not appropriately raised here. The Communications Act, which the TCPA amended, provides that any "proceeding to enjoin, set aside, annul, or suspend any order of the Commission" must be brought under the Hobbs Act. 47 U.S.C. § 402(a). The Hobbs Act provides the federal courts of appeals with "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity" of FCC orders. 28 U.S.C. § 2342(1). Thus absent a direct appeal to review the 2015 FCC Order's interpretation of an autodialer, we are bound to follow it. *See CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 448–50 (7th Cir. 2010) (holding that 2008 FCC ruling had force of law); *see also Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1308 (11th Cir. 2015) (same as to 1992 FCC ruling interpreting prior express consent). Remarkably, neither party mentions just such a direct appeal currently pending in the D.C. Circuit, where multiple companies filed petitions under the Hobbs Act challenging the 2015 FCC Order and its definition of an autodialer in particular. *See ACA Int'l v. FCC*, No. 15-1211 (D.C. Cir., argued Oct. 19, 2016); *see also Ankorn v. Kohl's Corp.*, No. 15-1303, 2017 WL 395707 at *2–3 (N.D. Ill. Jan. 30, 2017) (granting stay in TCPA class action case pending decision in *ACA Int'l* and noting that "numerous courts across the country have granted similar motions to stay in TCPA cases while the D.C. Circuit case is pending").

Instead, we turn to Akira's argument (not reached by the district court) that it is entitled to summary judgment independent of the autodialer question because Blow consented to the text messages. *See, e.g.*, *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 681 (7th Cir. 2007) ("Because our review is de novo, we may affirm the judgment on any basis that is sup-

ported by the record before us."). As described above, the TCPA's prohibition on using an autodialer applies only "absent the express consent" of the recipient. 47 U.S.C. § 227(b)(1)(A)(iii); *see also In re Rules & Regs Implementing the TCPA*, 7 FCC Rcd 8752, 8769 ¶ 29 (Oct. 16, 1992) ("1992 Order") ("The TCPA allows autodialed and prerecorded message calls if the called party expressly consents to their use."). Express consent is an affirmative defense on which the defendant bears the burden of proof. *See In re Rules & Regs Implementing the TCPA*, 23 FCC Record 559, 565 (2008); *see also Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017).

In its initial rulemaking after the TCPA's passage, the FCC explained in its 1992 Order that "persons who knowingly release their phone number have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary." 7 FCC Record at 8769, ¶ 31. In elaborating, the FCC explained that "telemarketers will not violate our rules by calling a number which was provided as one at which the called party wishes to be reached. *Id.* It further specified in 2012 that texts and calls that include or introduce an advertisement or constitute telemarketing require express written consent. *See* 47 C.F.R. § 64.1200(a)(2). In its 2015 Order, the FCC added little to its existing pronouncements on consent, except to clarify that the existence of a consumer's wireless number in another person's wireless phone, standing alone, does not demonstrate consent to autodialed texts. It also clarified that consent could be revoked "at any time and through any reasonable means." 30 FCC Rcd at 7989–90, ¶ 47.

18                                            Nos. 16-1484 & 16-1608

The record demonstrates that Blow gave her cell phone number to Akira on several different occasions. First, Blow signed up sometime in 2009 or 2010 for what she characterized in her deposition as a "frequent buyer card." This card could be used to earn Akira gift certificates when certain spending thresholds were reached. (Blow dep. p. 29–30, l. 16–24; p. 30 l. 16–20) Akira also produced an "AKIRA VIP" Card and an "AKIRA CLIENT LIST" card with Blow's name and cell phone number. Both of the cards contained the following disclaimer: "INFORMATION PROVIDED TO AKIRA IS USED SOLELY FOR PROVIDING YOU WITH EXCLUSIVE INFORMATION AND SPECIAL OFFERS. AKIRA WILL NEVER SELL YOUR INFORMATION OR USE IT FOR ANY OTHER PURPOSE." There are also notes reflecting Blow's request for a sales associate to call her when a particular pair of shoes arrived back in stock. Finally, the record establishes, and Blow admits, that she texted "AKIRA" to short code 46786 on October 1, 2009 in order to opt into Akira's text program.

Blow received a total of 60 texts from Akira between September 23, 2009 and May 27, 2011. The first text Akira sent Blow in September 2009 included instructions on how to be removed from Opt It's text messaging list as follows: "To unsubscribe reply STOP to 46786." Likewise, the text sent in response to her October text opting into the text club contained instructions as to how to unsubscribe, as did a text sent in July 2010. Blow never followed the instructions in these texts or otherwise attempted to opt out of receiving texts from Akira.

Blow cursorily argues that she never consented to Akira's texts because she "provided her phone number to [Akira] to receive discounts" but not to receive "mass marketing text

messages." We are unpersuaded that there is a distinction of legal significance between the two in terms of Blow's consent: the alleged "mass marketing" texts were in fact the very "exclusive information and special offers" described on Blow's Akira VIP and client cards. For example, the first text Blow received from Akira on September 23, 2009 welcomes Blow to Akira's text club and invites her to watch for "exclusive PROMOTIONS, EVENTS & DISCOUNTS from AKIRA Chicago." She received four additional texts from Akira before she herself opted into its text club.

Blow's attempt to parse her consent to accept some promotional information from Akira while rejecting "mass marketing" texts construes "consent" too narrowly. We agree with the Ninth Circuit's recent conclusion that "an effective consent is one that relates to the same subject matter as is covered by the challenged calls or text messages." *Van Patten*, 847 F.3d at 1044–45. In *Van Patten*, the Ninth Circuit concluded that the plaintiff had given prior express consent to be contacted on his cell phone number when he provided that number in connection with his application for a gym membership. *Id.* at 1044. Although he had cancelled his gym membership when he received the challenged texts, the court concluded that the texts, which were part of a campaign to get former and inactive gym members to return, related to the reason the plaintiff had supplied his number in the first place: to apply for a gym membership. *Id.* at 1046. Thus, although the court rejected the defendant's contention that when a consumer provides her cell phone number to the caller she is consenting to any and all contact, it reasonably concluded that if the contact is related to the reason the number was provided, consent is valid. *Id.*

Likewise, the 11th Circuit rejected a plaintiff's argument that he had not expressly consented to texts from a blood and plasma seller when he provided his cell phone number on a "New Donor Information Sheet" that he filled out before he was paid for blood and plasma donations. *Murphy*, 797 F.3d at 1304. Nowhere did the form he filled out with his cell phone number inform the plaintiff that he would receive a promotional text from the defendant offering him a "come back special" to donate again. Nevertheless, the court in *Murphy* concluded that by "voluntarily providing his cell phone number" to the defendant, the plaintiff gave his prior express consent to be contacted. *Id*. at 1308.

We have even less trouble concluding that Blow consented here, where she admittedly provided her cell phone number not on a generic form, but specifically in order to receive discounts. Both cards in the record containing Blow's name and cell phone number clearly state that her information would be used to provide exclusive information and special offers. Of the sixty texts Blow received, one welcomed her to the text club, forty-one contained a promotional or discount offer, and the remaining eighteen announced special events such as fashion shows, events that fit comfortably within the aforementioned "exclusive information" described on the cards. Because the texts she received were reasonably related to the purpose for which she provided her cell phone number, we agree that Blow provided prior express consent for the text messages.

The district court cases Blow cites do not support a contrary conclusion. Blow makes much of the district court's observation in *Zeidel v. YM LLC USA* that "providing one's phone

number does not constitute *carte blanche* consent to receive automated marketing messages of any kind," No. 13-6989, 2015 WL 1910456, at *3 (N.D. Ill. Apr. 27, 2015); *see also Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 737 (N.D. Ill. Dec. 1, 2014) ("Consent for one purpose does not equate to consent for all purposes."). We agree, and do not hold as much here. As discussed above, here Blow's consent was in fact tied to the type of messages she received from Akira. The other case cited by Blow, *Kolinek v. Walgreen Co.*, was decided on a motion to dismiss, and the district court was obligated to accept as true the plaintiff's assertion that he provided his cell phone number to the pharmacy at Walgreen's "solely for verification purposes," but then received automated robocalls reminding him to refill his prescription, No. 13-4806, 2014 WL 3056813 at *1 (July 7, 2014). The rule the district court judge reached in *Kolinek* was that the FCC "considers the scope of a consumer's consent to receive calls to be dependent on the context in which it is given." *Id.* at *3; *see also Thrasher-Lyon v. CCS Commercial*, No. 11-04473, 2012 WL 3835089 (N.D. Ill. Sept. 4, 2012) (denying defendant's motion for summary judgment on issue of consent because plaintiff had given out number as "best way to reach her" to insurance company, which was not consent for robocalls from a third-party collection agency), a rule in complete harmony with the one we apply today. In short, although the district court decisions are of course non-binding precedent, there is nothing in the cases Blow cites that is inconsistent with our conclusion that giving her cell number to Akira for a VIP discount card and later texting directly to

opt in to the text club amount to express consent to texts about Akira discounts, in-store promotions, and special events.[3]

Because the class was certified before the entry of summary judgment, Akira maintains that summary judgment against Blow on this issue applies to the class as a whole. Blow has failed to respond to this contention. *E.g.*, *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) (perfunctory and undeveloped arguments are waived). Paradoxically in light of the grant of summary judgment in its favor and its argument as to consent, as discussed below, Akira itself has cross-appealed seeking to *de-certify* the class on the issue of consent. In the district court, Blow claimed and the district court agreed that the question was not whether members of the class had provided their information to Akira, but rather whether the provision of that information indeed amounted to consent. As discussed above, we now hold that it does. Absent any argument by Blow that there remains a subset of the class who provided no consent at all or whose consent was more limited than hers, the entry of summary judgment is appropriate as to the class as well, but would not be effective as to any class members who could

---

[3] This is so notwithstanding Blow's suggestion that her consent was limited to information about a particular pair of shoes. While she may have specified when she gave her cell phone number on that occasion that she wanted information about shoes, it is clear that she provided her cell phone number without express limitation to Akira on multiple other occasions. Blow has failed to provide evidence that the additional provision of her number to find out about a pair of shoes was intended in any way to limit or revoke consent associated with the other occasions she provided her number.

demonstrate that they never provided their phone number to Akira to receive information about discounts or promotions.

That leaves the issues Akira raises in its cross-appeal. First, there is Akira's argument that the class was improperly certified. Without citing a single Seventh Circuit case, Akira argues generally that Blow failed to demonstrate that common issues predominate in the case because individualized inquiries are necessary to determine whether each class member consented to the texts. Given that this argument directly undermines Akira's argument as to Blow's consent and its power to bind the class members, it is a perplexing position to take, to say the least.

The prerequisites for a class action are established in Federal Rule of Civil Procedure 23(a), which sets forth the following four requirements:

> (1) the class is so numerous that joinder of all members is impracticable (numerosity)

> (2) there are questions of law or fact common to the class (commonality)

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and

> (4) the representative parties will fairly and adequately protect the interests of the class (adequacy of representation). In addition to these requirements, the class must satisfy one of four conditions listed in Rule 23(b).

As relevant here, Rule 23(b)(3), applicable for purported classes seeking monetary damages, requires an additional showing (1) that the questions of law or fact common to the members of the proposed class predominate over questions affecting only individual class members; and (2) that a class action is superior to other available methods of resolving the controversy. Fed. R. Civ. P. 23(a); *see also Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015).

We review the district court's decision certifying the class only for an abuse of discretion. *Bell*, 800 F.3d at 374. Although our review is deferential, it is exacting: "'A class may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites'" have been met. *Bell*, 800 F.3d at 373 (quoting *CE Design, Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 723 (7th Cir. 2011).

Akira attacks the district court's certification only on the question of commonality, arguing that determining whether each plaintiff had consented to the texts from Akira would require a series of mini-trials . As discussed above, the district court considered and rejected this argument, pointing out that the commonality prerequisite was established because the class members' claims arise from the same factual circumstances and are evaluated under the same statute. *See Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) ("Common nuclei of fact are typically manifest where … the defendants have engaged in standardized conduct towards members of the proposed class."). And in determining whether Blow was an adequate representative of the class, the district court noted that Blow produced over 20,000 pages of customer loyalty cards in discovery, creating a common issue of whether the customer

loyalty cards operated to provide consent to Akira's texts, as opposed to a need to engage in a series of mini-trials as to which plaintiffs are subject to the defense of consent. Neither party challenges this conclusion on appeal, and we are thus hard-pressed to find an abuse of discretion in the district court's conclusion that the commonality requirement for class certification was satisfied. *See Bell*, 800 F.3d at 379 ("The fact that the plaintiffs might require individualized relief or not share all questions in common does not preclude certification of a class."). To repeat, if there is a subset of Akira customers who did not fill out customer loyalty cards or opt into the text club, they would of course not be bound by the entry of summary judgment against Blow.

Finally, Akira challenges the district court's rejection of its motion for sanctions against Blow's counsel for alleged frivolous filings and instances of bad faith over the course of the litigation. We review the denial of sanctions under Rule 11 for an abuse of discretion, *e.g.*, *Cooney v. Casady*, 735 F.3d 514, 518 (7th Cir. 2013). A district court abuses its discretion when "no reasonable person" would agree with the decision of the court. *Id.* Under Rule 11, sanctions are proper when a party or attorney signs a pleading or motion that is not well-grounded in fact and warranted by existing law. Fed. R. Civ. P. 11. Additionally, an attorney who vexatiously multiplies the proceedings may be responsible under 28 U.S.C. § 1927 for excess fees and costs arising from the improper conduct.

We see no abuse of discretion in the district court's conclusion that the litigational conduct of Blow's counsel did not rise to the level of impropriety that would warrant sanctions. Akira claims Blow's counsel knew she expressly consented to receive

the texts and was therefore pressing a claim that was not supported by existing law. Akira also attacks counsel's failure to disclose that Strickler, the original named plaintiff, was a member of the law firm representing her. This latter behavior certainly gives us pause, and we would hope Strickler and Messer would exercise better judgment in the future than using an attorney from their own firm as the named plaintiff in a class action. Despite our misgivings about the firm's judgment, we do not think the district court abused its discretion by concluding sanctions were not warranted. And although we ultimately reject Blow's claim that her consent did not extend to the various types of texts that Akira sent, we would not go so far as to conclude that her position was so baseless as to warrant sanctions.

### III.

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment against Blow.